[L. A. No. 14892. In Bank.—December 28, 1934.]

RUCKSTELL CORPORATION LTD., Respondent, v. GREAT LAKES AIRCRAFT CORPORATION, Appellant.

O'Melveny, Tuller & Myers, Homer I. Mitchell, Albert Parker and Walter K. Tuller for Appellant.

Kaye & Johnstone for Respondent.

THE COURT.—Upon a thorough reading of the evidence and briefs, we are satisfied with the disposition made of this cause by the District Court of Appeal, Second District, Division Two, and we therefore adopt its opinion as and for the decision of this court. It reads:

"From a judgment in favor of plaintiff entered on the verdict of a jury, defendant has appealed.

"Plaintiff's last amended complaint claims damages by reason of the breach by defendant of an alleged contract with plaintiff under which the latter alleged it was acting as distributor in southern California and Arizona of airplanes manufactured by defendant. A part of the damages allowed by the jury for such alleged breach was the sums of money laid out in preparing to perform and in performing such contract, less the income received from such performance and the value of materials on hand at the time performance was prevented.

"Many points are urged by appellant, but most of them are based on the contention that the evidence does not support the finding of the jury by special verdict that a contract was entered into between plaintiff's assignor and defendant, as alleged in the complaint, on July 18, 1929, or in fact at any time, and that in consequence there was no such contract to breach. It is not questioned that there were some sums due plaintiff from defendant for labor done, supplies furnished and money advanced at plaintiff's

[defendant's] request, but such amounts do not aggregate the large judgment given, $26,570.87, which can only be justified by the existence of the contract alleged.

"The evidence shows without dispute that on April 19, 1929, J. G. (Tex.) Rankin was appointed distributor for defendant corporation's products in California, Washington, Oregon and Idaho, and that he had contracted to buy from defendant one hundred airplanes of different models, it being provided in such contract that if within ninety days from date of the agreement he increased such contract by agreeing to purchase one hundred additional planes, the following states would be added to his territory, viz., Montana west of the Rocky mountain continental divide, Nevada, Utah and Arizona. The contract also provided that it could be cancelled by either party with or without cause by mailing the other written notice of its intention so to do, and that such cancellation should operate as a cancellation of all orders for planes or parts not actually shipped; and further, that the relation created between the parties by the contract was that of 'vendor and vendee and not principal and agent, and neither the distributor nor any of its associate dealers, subdealers or employees shall be deemed the representatives of the company for any purpose whatever'. It was further provided that before closing an agreement with any associate or subdealer a copy of the proposed agreement should be submitted to defendant corporation. This contract was cancelled by defendant 'about the first of October, 1929.'

"On or about July 18, 1929, G. E. Ruckstell, who was well and favorably known as the manufacturer and distributor of an improved axle for Ford cars, met Rankin, who interested him in selling planes made by defendant. Ruckstell testified that Rankin said 'that if I would make the arrangement to properly establish such an account such as a suitable hangar and location and have the proper personnel that was necessary for the conduct of such a business, and that if I would agree to take five planes per month until sixty total were taken, delivery to be made one carload at the time, each carload to include five airplanes per month, and if I would endeavor to establish dealers throughout the territory, and provided after talking with the Great Lakes Company . . . and it had their approval,

*he* would appoint me distributor for Southern California and Arizona . . . He said they had the approved type certificate and that . . . there should be no difficulty in licensing of these planes, . . . and as far as he knew they were satisfactory, and that if it was not that the factory would take care of any difficulty that would come with that product, or replace anything that was defective . . . I said that providing these things we were to get would be actually carried forth, it would be agreeable to me to make such an agreement on that territory. . . . Mr. Rankin said he would like to put into writing these various things that we had talked of. I also stated that I would like to have it in writing. So . . . he said upon his return to Portland that he would send me a written arrangement or understanding of what we had entered into, and I was to do likewise. And that is generally what took place there. . . . I told him I had formed this corporation with my name to directly connect whatever little business acquaintance I had in this territory with my business, and that I would do all the necessary things to properly conduct such an account.' Mr. Ruckstell further testified that he had talked with Rankin prior to July 18th and that on one occasion 'Mr. Rankin said that *he* would like to make me a dealer or distributor for the Great Lakes Aircraft Company. . . . I told Mr. Rankin that I did not want to be just a local dealer or a small dealer. If I went into the agreement it would have to be for a larger territory. Mr. Rankin said he would release Southern California and Arizona.'

"Miss Eleanor Straka, secretary of plaintiff corporation and prior thereto 'secretary to Mr. Ruckstell, personally, for seven years', who was present at the conversation between Ruckstell and Rankin, testified that 'Mr. Rankin said in substance that in consideration of the organization of the corporation by Mr. Ruckstell and the embodying of Mr. Ruckstell's name and the renting of the necessary hangars and the employing of personnel and all the facilities for handling a business of the kind that was in contemplation, and the purchase or rather I should say the agreement to take sixty airplanes, four of which were then in Los Angeles, *Mr. Rankin was to see to it* that Mr. Ruckstell was given the exclusive distribution of Great Lakes airplanes by the Great Lakes Company', and that as

a step to accomplish it he would communicate with Mr. Van Sicklen, vice-president of the Great Lakes Corporation. 'Mr. Rankin said Mr. Ruckstell at that time would receive five per cent of the commission to be paid.' A telegram sent in furtherance of such understanding reads in part: 'Have closed Southern California and Arizona with Ruckstell subject to minor changes regarding exclusive territory,' and requested the diversion of a car of planes from Portland to G. E. Ruckstell, that draft be sent to Bank of Italy, Olive street branch, Los Angeles, and that the next car be sent to Portland. It also asked where Rankin could communicate with Van Sicklen the next morning at six.

"Mr. Ruckstell further testified that Rankin told him that he (Rankin) had an agreement with defendant corporation giving him the exclusive right to sell their planes on the Pacific Coast, *and that he wanted Ruckstell to sell planes in the southern part of his territory* under an arrangement 'whereby I would take a part of the commissions and he would take a part. *He said that he would make me a subdistributor in the southern part of his territory. As such subdistributor I would get fifteen per cent of the twenty per cent commissions, and would give him or see that he got five per cent.* I said I would agree to buy sixty airplanes. He told me he had agreed with the Great Lakes Aircraft Company to buy some planes; that sixty of these *he wanted to turn over to me.*' At that time Rankin had five planes with the Pacific Finance Company of Los Angeles, which company held them for payment of a balance due on the purchase price. Four of these were turned over by Rankin to Ruckstell, who paid the finance company's balance and repaid Rankin's company for the amount it had paid on the purchase price, Ruckstell taking his fifteen per cent commission and Rankin getting five per cent. Mr. Ruckstell then reiterated: 'I told Rankin that *if he would give me a subdistributorship,* giving me the exclusive right to sell in Southern California, I would go out and try to sell airplanes, that I would pay him five per cent, that I would organize the corporation, that I would carry parts and put in the proper persons to take care of service and do a certain amount of demonstrating and advertising—all things that are expected of anybody handling an account of that character. Mr. Rankin said if I would organize the cor-

poration and put in this personnel, and buy sixty airplanes, that he would get me the territory—*that he would make me the exclusive dealer in this territory that we had discussed.*

"Fourteen planes were purchased by plaintiff or its assignor, Mr. Ruckstell, and the evidence shows that the commission was divided as stated, except on the last five. As to the commission on these Mr. Rankin testified, apparently without contradiction, that plaintiff or its assignor, Ruckstell, owed his company $845 for parts shipped and charged to Rankin Airplane Sales Company, as well as commissions on the last five of the fourteen planes, for all of which bills had been sent; that in the meantime he, Rankin, came to Los Angeles, and inasmuch as Ruckstell still had the 'ships' he, Rankin, 'really felt I should not charge him any commission on it, and so I said if you will pay us the $845.00 we will forget about the commission, which he did'.

"While Mr. Van Sicklen, with whom Mr. Rankin talked from Los Angeles after his conversation with Mr. Ruckstell above referred to, and who was vice-president and general sales manager at the time, . . . was not a good witness, it is perfectly clear from his evidence that the only understanding he had from such conversation was that Rankin, 'acting as distributor for the territory of the Pacific Coast, had given Ruckstell, subject to my approval, a dealership or subdistributorship that was to include Southern California and Arizona', and that he did not understand 'that the Great Lakes Aircraft Corporation was entering into any contract with G. E. Ruckstell or Ruckstell Corporation Limited'.

"In addition to the testimony already quoted, there is a letter on the letterhead of plaintiff corporation, signed by its director Burkhardt and dated September 12, 1929, relative to the difficulty of licensing the fourteen planes mentioned, addressed to Rankin Airplanes Sales Company, 409 Corbett Bldg., Portland, Oregon, stating in substance that defendant had reported the first four ships sold to Rankin Flying Service, and inasmuch as 'Tex' Rankin gave G. E. Ruckstell a bill of sale for them, the department of commerce and labor had returned their applications for licenses with request for 'bills of sale from Great Lakes to Rankin Flying Service and from Rankin Flying Service to Tex Rankin, to complete the line of ownership', and that the

same were required as to the second car of five planes, but that as to 'the last carload, your bill of sale is O. K. and we need only that of Great Lakes to you for completion'. W. D. Sheffey, who had charge of the bookkeeping of plaintiff corporation, testified that the books of that company showed the 'purchase of the fourteen Great Lakes airplanes from Rankin'. The evidence shows without conflict that during September of 1929 plaintiff was dissatisfied with the arrangement made with Rankin and was trying to get him to release his claim on the territory in which it was selling, and a telegram from G. E. Ruckstell to C. F. Van Sicklen, Great Lakes Aircraft Corporation, dated the 18th of that month, says in part: 'If agreeable with you Rankin will relinquish California, Nevada, Utah and Arizona, for which I will pay him thousand dollars giving me these states direct with you,' to which Van Sicklen replied, in part: 'Hold deal with Rankin until I arrive.' This was followed by a wire from Ruckstell as follows: 'Consummation deal with Rankin can await your arrival here but must know your attitude regarding direct distributorship which I cannot close without additional discount and territory and which delay may forfeit. . . . If you are forwarding proper bills of sale to Rankin on all ships and Rankin in turn forwards us proper bills of sale on all ships licenses will be issued. Certified invoices are not acceptable.' To this defendant answered by wire to plaintiff. 'Our attitude regarding your acting as direct distributor is favorable. Want to discuss with you personally general details covering territory dealers number of ships and schedule also discounts. . . . '

"Following this exchange of telegrams Van Sicklen came to Los Angeles and an agreement dated October 2, 1929, was signed by plaintiff and Van Sicklen for defendant subject, however, to approval at the office of defendant, which agreement, except for the territory named, was very similar to that theretofore given Rankin, including the provision for cancellation by either party, and which appointed plaintiff distributor for California, Nevada, Arizona, Utah and the Hawaiian Islands. Plaintiff deposited the sum of $1,750 upon the execution of this agreement. Defendant's approval of such contract was not given, as a new plan of distribution was contemplated, and plaintiff, treating the fail-

ure to approve as a cancellation, through G. E. Ruckstell wired defendant as follows: 'We hereby accept cancellation your contract. As our order for show planes was subject to contract this cancels our order for these planes so do not ship them. . . . Please return our deposit money . . . '

█ "We do not believe, under the evidence in this case, that any other conclusion can be drawn than that the alleged oral contract of July 18, 1929, was simply an arrangement between Rankin, the Pacific Coast distributor of defendant corporation, and plaintiff's assignor, by which plaintiff, under Rankin, acquired the exclusive right to sell planes manufactured by defendant in part of Rankin's territory, plus the state of Arizona, which was not allotted Rankin by contract but (which he had the option under his contract to acquire and) which defendant was apparently satisfied to let him have; that there was no direct contract of agency between defendant and plaintiff or its assignor, and that when Rankin's contract was cancelled, any right plaintiff had fell with it. Nor in our opinion does the use of the word 'distributor' by defendant, in speaking of plaintiff at various times, mean anything more than that it had the exclusive right of sale which resulted from its arrangement with Rankin and under the Rankin contract; and we fail to see any conflict with the direct and positive evidence which shows that no direct contract existed with defendant."

Judgment reversed.